1  Eileen Ahern (Bar No. 216822)
   eahern@willenken.com
2  Rebecca T. Green (Bar No. 247690)
3  rgreen@willenken.com
   WILLENKEN WILSON LOH & DELGADO LLP
4  707 Wilshire Blvd., Suite 3850
5  Los Angeles, California 90017
   Telephone:  (213) 955-9240
6  Facsimile:   (213) 955-9250
7
8  Attorneys for Plaintiff
   HARBOR FREIGHT TOOLS USA, INC.
9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| 13 HARBOR FREIGHT TOOLS USA, INC., a Delaware corporation,<br><br>15           Plaintiff,<br><br>16 v.<br><br>17<br>GENCO MARKETPLACE, INC., a<br>18 Pennsylvania corporation, and DOES 1<br>19 through 10, inclusive,<br><br>20         Defendants. | Case No.: 2:16-cv-5661<br><br>**COMPLAINT FOR:**<br><br>  **1. BREACH OF CONTRACT**<br>  **2. PROMISSORY FRAUD**<br>  **3. TORTIOUS INTERFERENCE<br>     WITH PROSPECTIVE<br>     BUSINESS RELATIONSHIP**<br>  **4. UNFAIR COMPETITION**<br>  **5. PROMISSORY ESTOPPEL**<br><br>**DEMAND FOR JURY TRIAL** |

21
22
23
24
25
26
27
28

COMPLAINT

139622.1

1    Plaintiff, Harbor Freight Tools USA, Inc. ("HFT" or "Plaintiff"), by and

2 through its attorneys of record, alleges as follows against GENCO Marketplace,

3 Inc. and Does 1 through 10 (collectively "GENCO" or "Defendants"):

4

5                          **NATURE OF THE ACTION**

6    1.    This case involves GENCO's contractual breaches, failure to pay

7 amounts due, and fraudulent promises by GENCO regarding its ability and/or

8 willingness to perform its contractual duties at agreed-upon prices, as well as

9 GENCO's interference with the prospective business relationship between HFT

10 and one of GENCO's competitors, Inmar, Inc.

11

12                              **THE PARTIES**

13    2.    Plaintiff is a Delaware corporation having its principal place of

14 business at 26541 Agoura Road, Calabasas, California 91302.

15    3.    On information and belief, GENCO is a Pennsylvania corporation

16 having its principal place of business at 100 Papercraft Park, Pittsburgh,

17 Pennsylvania 15238.

18    4.    Defendants DOES 1 through 10 are individuals and/or entities whose

19 true names and capacities are presently unknown to HFT.   HFT is informed and

20 believes, and thereon alleges, that at all times herein mentioned, each of the

21 fictitiously named defendants was the agent, servant, and/or employee of his or her

22 co-defendant and, in doing the things herein mentioned, was acting within the

23 scope of his or her authority as such agent, servant, and/or employee, and with the

24 permission and consent of his or her co-defendants, and that each of said

25 fictitiously named defendants is, in some manner, liable or responsible to HFT

26 based upon the facts hereinafter alleged and thereby proximately caused injuries

27 and damages to HFT as more fully alleged herein.   Accordingly, HFT sues said

28 defendants by said fictitious names.   As such time as their true names and

COMPLAINT
1

1  capacities become known to HFT, HFT will seek leave to amend this Complaint to

2  insert said true names and capacities of such individuals and/or entities.

3

4  **JURISDICTION AND VENUE**

5      5.      This Court has diversity jurisdiction over this action pursuant to 28

6  U.S.C. § 1332 because there is complete diversity of citizenship between the

7  parties, and the amount in controversy exceeds the sum or value of $75,000,

8  exclusive of interest and costs.

9      6.      This Court has personal jurisdiction over GENCO in this action

10 because HFT's claims arise out of GENCO's acts, omissions, events, and

11 transactions that occurred, in substantial part, within the state of California, County

12 of Los Angeles, and as a result of GENCO's purposeful engagement in business

13 transactions with HFT, a California citizen.  Additionally, GENCO maintains its

14 own facility in Sacramento, California (at which HFT and GENCO have met

15 regarding the returns operations program that is the subject of this dispute), and

16 HFT is informed and believes that GENCO conducts business throughout the state

17 of California.

18     7.      Venue is proper in the Central District of California under 28 U.S.C.

19 §§ 1391(b)(2) because a substantial part of the events giving rise to this litigation,

20 including negotiation of the contract and the injury to HFT, occurred in the Central

21 District of California, and, on information and belief, GENCO transacts business in

22 the Central District of California and may otherwise be found in this district.

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

139622.1

## GENERAL ALLEGATIONS

**HFT and GENCO's Relevant Business Backgrounds.**

8.     HFT was started as a small family-owned business in 1977 and is now a national chain selling quality tools at low prices both online and in brick and mortar stores in California and across the United States.

9.     GENCO markets itself as "North America's Largest Wholesaler of Retailer Returns."  It is in the business of providing third-party returns management and liquidation.  Its facilities are located throughout the country, including in Sacramento, California.

10.     HFT, like all retailers, has products returned to its stores by customers.  Some of the products are returned unused and intact in their boxes and may be restocked.  Others, however, have been opened or used or damaged, or cannot be returned to the shelf for one reason or another.

11.     For many years, HFT performed its own returns management operations—it would, among other things, restock certain products, repair and refurbish certain products as necessary, and then resell the products to liquidators, who would sell them elsewhere at heavily discounted prices (and not under HFT's name).

12.     During the past several years, HFT has dramatically increased the number of its stores nationwide, and became concerned that its own internal returns management operations would not be able to handle the concomitant increasing returns volume.  Accordingly, in 2013, HFT decided it would seek an outside vendor to handle some of the existing and future returns volume.

**GENCO and Inmar Compete for a Business Relationship with HFT.**

13.     In 2013, HFT issued a request for proposal ("RFP"), inviting third parties to bid for a contract to perform HFT's returns management operations and

139622.1

to purchase/liquidate HFT's returned products.  HFT elected to enter into pilot agreements with two of the companies that submitted proposals, GENCO and Inmar, Inc. ("Inmar"), in order to (a) allow HFT to evaluate their respective performances before committing to a longer-term relationship with one of the companies and (b) allow GENCO and Inmar time to review the types, mix, and condition of HFT's returned products, determine how to effectively manage and resell such products, and refine their respective pricing offers to HFT for a potential longer-term relationship.  Indeed, at Genco's request, prior to entering into any agreement, HFT sent Genco approximately 770 returned products from HFT retail stores so Genco could complete whatever investigation they desired regarding the type, mix, and condition of returned products that would be sent by HFT.

14.     In or about October 2014, HFT and GENCO entered into a pilot Returns Management Operation and Purchase Agreement (the "Pilot Agreement"), pursuant to which, *inter alia*, GENCO was obligated to conduct certain returns management operations for HFT, for which HFT would pay GENCO certain agreed-upon amounts.  And, *inter alia*, as part of its obligations under the agreement, GENCO would purchase all returned products shipped from HFT stores to GENCO ("Liquidation Merchandise"), for which GENCO would pay HFT a certain agreed-upon "Liquidation Purchase Price," which was defined as a percentage of HFT's regular, company-wide selling price for a product (the specific rate is protected by the Pilot Agreement's confidentiality provision).  The Liquidation Purchase Price was a small fraction of HFT's regular list price for such products, as it reflected GENCO's valuation of the types, mix, and condition of the products and the "as-is"/no warranty nature of the purchase.

15.     During the same time period that HFT and GENCO entered into the Pilot Agreement, HFT and Inmar likewise entered into a pilot Returned Goods Inventory Purchase and Liquidation Agreement.

139622.1

16.     Both GENCO and Inmar performed well enough under their respective pilot agreements that in April 2015 they were invited to provide proposals for a longer-term contract with HFT.  Both companies expressly stated they wanted to continue their respective business relationships with HFT.  Both companies were aware of one another's business relationship with HFT, aware they were in competition for the same prospective business relationship, and aware that HFT only intended to enter into one long-term contract with either Inmar or Genco.

17.     On April 21, 2015, GENCO made a firm offer to purchase HFT's Liquidation Merchandise and handle HFT's returns management operations during a prospective one-year contract—in fact, GENCO, through its directors, officers, and/or managing agents, including but not limited to Gregor Thompson, represented that it believed the pilot program had been so successful that it offered to honor the same "Liquidation Purchase Price" to which HFT and GENCO had agreed during their pilot contract.  And, GENCO further represented it was competent to handle HFT's returns management operations operating under those terms—indeed, that GENCO had the expertise to do so and thus should be awarded HFT's business.

18.     That same day, HFT accepted GENCO's offer during an in-person meeting between the parties.  HFT and GENCO, through its directors, officers, and/or managing agents, including but not limited to Gregor Thompson, agreed the parties had a deal. They further agreed to update the Pilot Agreement already in place to memorialize the terms of the new one-year agreement (the "2015 Agreement").

19.     At that same meeting, HFT's representative expressly told GENCO, if the parties had a deal on the terms offered, then HFT would tell Inmar that the relationship between Inmar and HFT would not continue so that Inmar would not be strung along.  GENCO representative Gregor Thompson reassured HFT that the

1  parties had a deal on those terms, so HFT did not need to negotiate further with

2  Inmar regarding a long-term deal.

3      20.    On or about May 6, 2015, HFT had a call with Inmar during which

4  Inmar made an offer to handle HFT's returns management operations during a

5  prospective one-year contract.  HFT let Inmar know it had received more favorable

6  terms from GENCO, and thus HFT rejected Inmar's offer.

7

8  **HFT Further Relies Upon GENCO's Promises.**

9      21.    In May 2015, HFT and GENCO made some minor revisions to their

10  written agreement, unrelated to the Liquidation Purchase Price, and GENCO

11  acknowledged the parties were close to finalizing the memorialization of the

12  agreement.

13      22.    On or about June 2, 2015, GENCO requested that the 2015

14  Agreement be extended to become a three-year rather than a one-year agreement.

15      23.    On June 5, 2015, based on GENCO's promises that the parties had a

16  deal, and that GENCO would pay the agreed-upon Liquidation Purchase Price

17  under the 2015 Agreement, HFT sent Inmar a formal notice of termination of their

18  pilot agreement and rejection of its offer for a one-year contract.

19      24.    On or about June 8, 2015, HFT agreed to GENCO's requested

20  modification to lengthen the term of the 2015 Agreement as long as the parties also

21  agreed that the agreement would contain Liquidation Purchase Price increases in

22  years two and three.  In response to this request, GENCO agreed to the Liquidation

23  Purchase Price escalations.

24      25.    On June 10, 2015, GENCO apologized for its delay regarding the

25  finalization of memorialization of the 2015 Agreement and provided assurances

26  that the parties were on track for memorializing the agreed-upon terms.

27      26.    On July 7, 2015, GENCO provided a redlined contract memorializing

28  the 2015 Agreement, with the agreed-upon Liquidation Purchase Prices intact.

27.     On July 22, 2015, GENCO representatives, including officers, directors, and/or managing agents, including but not limited to Gregor Thompson, traveled to HFT's corporate headquarters in California.  There, they expressed their commitment to the parties' 2015 Agreement and negotiated GENCO's request to relocate certain returns operations from certain of GENCO's facilities to GENCO's **West Chester, Ohio** facility, to which HFT agreed.  Again, the agreed-upon Liquidation Purchase Prices were not renegotiated and did not change.

28.     On July 27, 2015, GENCO updated the contract to reflect the facility location change and an increase in the number of HFT stores expected to send inventory to GENCO.  Again, GENCO kept the agreed-upon Liquidation Purchase Prices intact.

29.     On July 30, 2015, HFT accepted GENCO's revisions, and returned the agreement to GENCO for signature.

30.     On August 7, 2015, HFT sent GENCO the finalized memorialization of the 2015 Agreement (*as last revised by GENCO and accepted by HFT*) with HFT's signature.

31.     On August 18, 2015, the parties began performing under the 2015 Agreement.  HFT began shipping to GENCO's West Chester, Ohio facility—the facility that GENCO had specifically negotiated to be included in the 2015 Agreement—and GENCO was performing under the 2015 Agreement by receiving the shipments at the West Chester facility.

32.     On September 9, 2015, HFT representatives met in person with GENCO representatives at the West Chester facility to brainstorm ideas for improving GENCO's operational efficiency for HFT's products under the 2015 Agreement.

33.     Throughout August and September of 2015, HFT made inquiries to GENCO about the status of signature of the memorialized 2015 Agreement. Directors, officers, and/or managing agents of GENCO, including but not limited

1    to Gregor Thompson, assured HFT that signature was imminent.

2        34.    During May through September 2015, in reliance upon GENCO's

3    representations as set forth above, HFT also drew down its own internal returns

4    management operations (including personnel, warehouse space, and other

5    resources) in order to shift them to GENCO.

6

7        **GENCO's Breaches.**

8        35.    On September 14, 2015, a GENCO director, Gregor Thompson, sent

9    an email to HFT expressing that GENCO was struggling operationally and

10   financially in its returns management program with HFT, and requested a meeting

11   with HFT leadership in Calabasas, California.

12       36.    On September 17, 2015, GENCO and HFT participated in the

13   requested in-person meeting in Calabasas.  At that meeting, GENCO

14   representatives Gregor Thompson and Bill Morrison announced that GENCO no

15   longer would go forward with the 2015 Agreement under which the parties were

16   already operating.  The GENCO representatives spun a tale totally contrary to their

17   prior representations—they claimed the pilot program had been unsuccessful and

18   therefore GENCO would need to wind down its Liquidation Merchandise

19   purchases and HFT returns management operations *unless* HFT would agree to

20   new pricing terms.  The pricing terms the GENCO representatives demanded were

21   wholly commercially unreasonable.  Indeed, the prices they offered to pay for the

22   products were below scrap value.  GENCO's conduct was in plain bad faith—and,

23   on information and belief, this conduct was designed to extract lower pricing now

24   that HFT had terminated its relations with Inmar, wound down its own internal

25   returns management operations, and was operating in full swing under the 2015

26   Agreement with GENCO.

27       37.     HFT was shocked by GENCO's conduct, and declined to renegotiate

28   the agreed-upon pricing.

COMPLAINT

8

139622.1

38.     That same day, after the meeting, Gregor Thompson phoned HFT from the airport and represented that the deal between the parties was still alive, and that GENCO would hold an internal meeting the following day in order to try to work something out.

39.     Yet the very next day, on September 18, 2015, GENCO sent a notice purporting to terminate the Pilot Agreement effective November 2, 2015, despite the fact that the 2015 Agreement was the operative agreement between the parties since as early as April 2015.  In fact, the 2015 Agreement required a ninety-day notice of termination, which GENCO failed to provide in breach of the agreement..

40.     Forty-five days later, GENCO began turning HFT's delivery trucks around at its facility entrances and refused to take further deliveries of Liquidation Merchandise and to further perform under the parties' agreement.

41.     At or around the same time, GENCO stopped paying the full contracted amount for Liquidation Merchandise that HFT had already sold and delivered to GENCO, pursuant to the terms of the parties' agreements.  GENCO has not, after repeated inquiries by HFT, paid or accounted for the failure to pay such outstanding amounts.

**GENCO's Additional Breaches and False Promises; HFT's Damages.**

42.     Under the parties' agreements, GENCO agreed to (a) provide comprehensive returns management services, including: scheduling, receiving, and categorizing inbound deliveries; handling, sorting, scanning, and inventorying returned goods (including etching of unique marks on the goods to minimize fraudulent store returns of such goods); providing detailed receipt and inventory logs to HFT; and returning "Exception Merchandise" to HFT for purposes such as recall or quality assurance; and (b) purchase all Liquidation Merchandise shipped from agreed-upon HFT stores in exchange for payment of the agreed-upon Liquidation Purchase Price.

139622.1

43.     Because the Liquidation Merchandise comprised all of the returned products from HFT's stores (minus products HFT stores destroyed-in-field before shipping to GENCO) and contained products in various conditions–from open-box but unused, used and in working condition, to damaged and possibly repairable– it was sold to GENCO on an "AS-IS," "WHERE-IS" basis "WITH ALL FAULTS" and with no warranties or guarantees regarding condition, quality, operation, or value.  Ownership and title to the Liquidation Merchandise simply passed to GENCO upon delivery and receipt at GENCO's facility, and there was no warranty, refund, or other remedy for the condition of the products.  GENCO negotiated the Liquidation Purchase Price with the knowledge that some of the products might be almost brand new and some would be beyond repair.  Both prior to and during the Pilot Agreement, GENCO received representative shipments of the Liquidation Merchandise, took the opportunity to review the product mix, condition, and quality, and negotiated the Liquidation Purchase Price accordingly. The Liquidation Purchase Price, which was a fraction of HFT's regular, company-wide listed price, reflected this bargain between the parties.

44.     However, in September 2015, around the time GENCO first notified HFT of its intent to no longer perform under its existing agreements, GENCO began, without notice to HFT and in breach of the parties' agreements, to unilaterally increase the quantity of products it destroyed to up to 30% of the Liquidation Merchandise that GENCO purchased and received from HFT, but did not pay HFT for such products, claiming that it could not resell them due to poor condition or quality.  There was no such right or remedy under the parties' agreements, as these were bargained-for "As-Is", "Where-Is" purchases with pricing that GENCO negotiated accordingly with full knowledge of the quality of the goods, and the quality of the Liquidation Merchandise had not changed since the prior Pilot Agreement started.

45.     GENCO currently owes HFT approximately $464,477 for products

139622.1

1 HFT sold and delivered to GENCO, but for which GENCO has failed to pay, under

2 the terms of the parties' agreements.

3    46.    Additionally, at various points throughout the relationship, but

4 particularly towards the end, GENCO likewise had failed to promptly process

5 returns inventory received and mismanaged and mishandled returns.

6    47.    In selecting between GENCO and Inmar, HFT also sought a vendor

7 that could create a sustainable market for HFT's returned goods.  As part of its

8 winning bid for HFT's long-term business, GENCO represented that it could easily

9 create a sustainable market for HFT's returned goods because it (a) was an expert

10 in returns management and liquidation and (b) already had such a market that it

11 could sell HFT's returned products into, as GENCO had another customer that was

12 a tool retailer with the same types of returned goods.  Unfortunately, neither

13 promise would come true.

14    48.    At the parties' September 17, 2015 meeting at HFT's headquarters, in

15 addition to learning GENCO was attempting to renegotiate the 2015 Agreement,

16 HFT learned that GENCO had failed to seek to diligently resell HFT's products in

17 all available markets as promised.  Instead, GENCO unilaterally and wrongfully

18 refused to offer and/or sell HFT's returned products to a number of markets and/or

19 customers that would be interested in HFT's returned products, because GENCO

20 did not want to harm the business of another of its clients, which was a direct

21 competitor of HFT.

22    49.    In addition to curtailing the available market for HFT's returned

23 products, GENCO's below-industry-standard performance under the parties'

24 agreements resulted in further, significant damage in the marketplace for HFT's

25 goods.  Instead of performing like the expert that GENCO represented itself to be,

26 it threw away perfectly good product, failed to adequately sort the product to

27 obtain the appropriate premium, and failed to take any action to repair product in

28 order to secure the best price in the market.  Additionally, since providing notice

COMPLAINT

11

139622.1

intended to terminate the parties' agreement, GENCO attempted to undercut HFT's profits in the marketplace by selling HFT product at dramatically below-market prices.  HFT's damages from this conduct continue to accrue, and amounts to at least $730,000 in lost profits.

50.     As a result of GENCO's breaches and false promises, HFT lost its opportunity for a prospective business relationship on specific terms with Inmar. HFT was forced to revert to handling its returns management operations internally rather than through Inmar, resulting in at least $1.9 million in lost profits under the terms offered by Inmar.

51.     In reliance upon GENCO's false promises of a long-term relationship, HFT had scaled back all of its internal returns processing operations.  HFT was forced to scramble to find additional facilities, to configure the buildings to accommodate the operations, as well as labor and trucking to accommodate bringing the volume of items that GENCO would have been handling into HFT facilities.  The rush to do so resulted in paying a cost premium, and thus damages of at least $700,000.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)
### (Against all Defendants)

52.     Plaintiff realleges and incorporates by reference the matters alleged in Paragraph 1 through 44 of this Complaint.

53.     HFT performed all conditions, covenants, and promises required to be performed by it in accordance with the terms and conditions of the parties' agreements and is excused from nonperformance of any conditions, covenants, and promises which it has not performed.

54.     As set forth above, GENCO breached and failed to substantially perform its obligations in accordance with the terms and conditions of the parties'

139622.1

1    agreements, and is not excused from any performance, covenants, and promises

2    thereunder.

3        55.    As a proximate result of GENCO's multiple breaches, HFT has been

4    injured and damaged as alleged herein an amount to be determined at trial.

5

6                        **SECOND CLAIM FOR RELIEF**

7                          **(Promissory Fraud)**

8                        **(Against All Defendants)**

9        56.    Plaintiff realleges and incorporates by reference the matters alleged in

10   Paragraph 1 through 48 of this Complaint.

11       57.    GENCO, by and through Gregor Thompson as set forth above,

12   promised to perform without the present intention to perform in several respects,

13   including by promising it would pay certain pricing terms and by representing it

14   would and could competently handle HFT's returns management operations.

15       58.    GENCO did so for the purpose of inducing HFT from acting in certain

16   respects and to refrain from acting in others.  Specifically, GENCO intended to

17   induce HFT into entering into an agreement with GENCO, and, on information and

18   belief, intended that HFT would terminate its business relationship and opportunity

19   for a prospective business relationship with Inmar, as well as wind down HFT's

20   own internal returns management operations.

21       59.    HFT did so act in reliance on GENCO's promise.  Specifically, in

22   reliance upon GENCO's promises, HFT entered into an agreement with GENCO,

23   terminated its business relationship and opportunity for a prospective business

24   relationship with Inmar, and wound down HFT's own internal returns management

25   operations.

26       60.    At the time GENCO made its promises, it had no intention to perform

27   upon the terms offered.  While GENCO's representatives offered assurances that

28   the parties had a contract and that GENCO would perform thereunder and

COMPLAINT

13

139622.1

1   performance should begin thereunder, shortly thereafter, it reneged and attempted

2   to renegotiate.  On information and belief, GENCO made these promises in order

3   to cause HFT to take certain actions that would create a better bargaining position

4   for GENCO, but would leave HFT with little choice but to take major losses or

5   accept GENCO's much-reduced pricing.

6       61.    HFT relied on GENCO's false promises, and has been injured and

7   damaged as alleged herein as a result in an amount to be determined at trial.

8

9                          **THIRD CLAIM FOR RELIEF**

10   **(Tortious Interference with Prospective Business Relationship)**

11                          **(Against All Defendants)**

12      62.    Plaintiff realleges and incorporates by reference the matters alleged in

13   Paragraph 1 through 54 of this Complaint.

14      63.    HFT and Inmar had an established business relationship.

15      64.    HFT offered Inmar the opportunity to continue that business

16   relationship in the future, and Inmar had offered contractual terms on which it was

17   willing to continue the business relationship.

18      65.    GENCO, its officers, directors, and/or managing agents were well-

19   aware of HFT and Inmar's business relationship, and likewise aware that Inmar

20   and HFT had offered each other the mutual opportunity of a continued business

21   relationship.

22      66.    GENCO representatives, knowing GENCO was in competition with

23   Inmar for that business relationship, wrongfully made false representations to HFT

24   regarding the contractual terms to which GENCO agreed and its intention and/or

25   ability to perform in accordance with those terms, in order to intentionally interfere

26   with HFT and Inmar's prospective business opportunity.

27      67.    After many assurances by GENCO regarding the terms of the contract

28   to which GENCO agreed and its ability and intention to perform pursuant thereto,

COMPLAINT

14

139622.1

1  HFT did in fact rely upon those false representations, and turned down Inmar's

2  offer for a continued business relationship between HFT and Inmar.

3      68.    Had GENCO not made those false representations, HFT would have

4  accepted Inmar's offer and entered into a new contract with Inmar.

5      69.    Instead, HFT relied on GENCO's false promises, and has been injured

6  and damaged as alleged herein as a result in an amount to be determined at trial.

7

8  **FOURTH CLAIM FOR RELIEF**

9  **(Unfair Competition)**

10  **(Against All Defendants)**

11      70.    Plaintiff realleges and incorporates by reference the matters alleged in

12  Paragraph 1 through 62 of this Complaint.

13      71.    HFT and Inmar had an established business relationship.

14      72.    HFT offered Inmar the opportunity to continue that business

15  relationship in the future, and Inmar had offered contractual terms on which it was

16  willing to continue the business relationship.

17      73.    HFT thus had a reasonable expectancy of entering into a valid

18  business relationship.

19      74.    GENCO, its officers, directors, and/or managing agents were well-

20  aware of that HFT and Inmar's business relationship, and likewise aware that

21  Inmar and HFT had offered each other the mutual opportunity of a continued

22  business relationship.

23      75.    GENCO representatives, knowing GENCO was in competition with

24  Inmar for that business relationship, wrongfully made false representations to HFT

25  regarding the contractual terms to which GENCO agreed and its intention and/or

26  ability to perform in accordance with those terms, in order to intentionally interfere

27  with HFT and Inmar's prospective business relationship.

28      76.    After many assurances by GENCO regarding the terms of the contract

COMPLAINT

15

139622.1

to which GENCO agreed and its ability and intention to perform pursuant thereto, HFT did in fact rely upon those false representations, and turned down Inmar's offer for a continued business relationship between HFT and Inmar.

77.     Had GENCO not made those false representations, HFT would have accepted Inmar's offer and entered into a new contract with Inmar.

78.     Instead, HFT relied on GENCO's false promises, and has been injured and damaged as alleged herein as a result in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
### (Promissory Estoppel)
### (Against All Defendants)

79.     HFT realleges and reincorporates by reference Paragraphs 1 through 71, inclusive, as though fully set forth herein.

80.     Various officers, directors, and/or managing agents of GENCO made promises as set forth above in April through September of 2015 that GENCO intended to honor the terms of the 2015 Agreement as agreed upon by both parties.

81.     Various officers, directors, and/or managing agents of GENCO made promises as set forth above in August and September of 2015 that GENCO was operating under the terms of the 2015 Agreement, and that they considered it to be valid and effective.

82.     Based on the promises of GENCO's officers, directors, and/or managing agents, HFT entered into the 2015 Agreement and performed under its terms.

83.     As the result of the GENCO's false promises, HFT terminated its business relationship with Inmar.

84.     As the result of GENCO's false promises, HFT wound down its own internal returns management operations, and was unprepared and unable to handle its returns processing operations internally when GENCO terminated the parties'

139622.1

1 agreement.

2      85.    When GENCO wrongfully ceased its performance under the 2015

3 Agreement, HFT suffered financial damage due to its inability to immediately

4 accommodate the large volume of returns and necessity to scramble to increase its

5 internal capacity to process the returns.

6      86.    As a result of HFT's reliance on GENCO's false promises, HFT has

7 been injured and damaged as alleged herein as a result in an amount to be

8 determined at trial.

9

10                             **PRAYER FOR RELIEF**

11     WHEREFORE, Plaintiff prays for relief as follows:

12     1.    For actual compensatory and consequential damages according to

13            proof;

14     2.    For prejudgment interest;

15     3.    For costs of suit, including attorneys' fees; and,

16     4.    Any other relief that the Court deems just and proper.

17

18 Dated: July 29, 2016            WILLENKEN WILSON LOH &
                                 DELGADO LLP
19

20

21                               By: */s/ Eileen M. Ahern*

22                                 Eileen M. Ahern
                                Attorneys for Plaintiff
23                                 HARBOR FREIGHT TOOLS USA,
                                INC.
24

25

26

27

28

139622.1

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff hereby demands trial by jury on all issues so triable.

3

4

Dated:  July 29, 2016

WILLENKEN WILSON LOH &
DELGADO LLP

5

6

By: */s/ Eileen Ahern*

7

Eileen Ahern
Attorneys for Plaintiff

8

HARBOR FREIGHT TOOLS USA,
INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

18